IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| STACI M. LAWRENCE, | ) | CASE NO. 1:21-CV-01691-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant, | | |

## I.    INTRODUCTION

Plaintiff Staci M. Lawrence ("Lawrence") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set forth below, I RECOMMEND that the Court OVERRULE Lawrence's assignments of error and AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On September 15, 2019, Lawrence protectively applied for disability, alleging a disability onset date of March 1, 2016. (Tr. 16, 173, 180).[1] Lawrence's application was denied initially and upon reconsideration, and Lawrence requested a hearing before an administrative law judge ("ALJ"). (Tr. 106-115, 120-27). On October 13, 2020, an ALJ held a hearing, during which Lawrence, represented by counsel, and an impartial vocational expert testified. (Tr. 44-60). The ALJ's decision became final on July 14, 2021, when the Appeals Council declined further review. (Tr. 1-7).

On August 31, 2021, Lawrence filed her Complaint challenging the Commissioner's final decision. (ECF Doc. 1). The parties have completed briefing in this case. (ECF Docs. 11, 14, 15). Lawrence asserts the following assignments of error:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

2. The ALJ erred in his evaluation as to whether Lawrence satisfied the criteria of a Listing at Step Three and his RFC was in error when he failed to find that Lawrence's severe impairments, separately and in combination with her pain, precluded her from engaging in substantial gainful activity on a sustained and fulltime basis.

3. The ALJ erred when he failed to include the treating source limitations in his RFC.

(ECF Doc. 11, PageID#2225).

## III.    BACKGROUND INFORMATION

### A.  Personal, Educational, and Vocational Experience

---

[1] On CM/ECF, the transcript referred to in this Report and Recommendation is ECF Doc. 7.

Lawrence was 20 years old at the alleged onset disability date. (*See* Tr. 16, 173, 180). She recently worked as a Sandwich Maker at Subway in December 2018. (Tr. 35, 240, 246, 249). She also worked as a State Tested Nurse Assistant (STNA) and Caretaker between July 2015 and March 2017, although not continuously, and stocked shelves at the Dollar General in 2017. (Tr. 240, 246). Lawrence stated that she stopped working due to her medical conditions and did not work after December 2018. (Tr. 239, 267, 279, 294).

### B. Relevant Hearing Testimony

#### 1. Staci Lawrence

Lawrence testified at the hearing. She testified that she could not perform full-time work because her legs caused her a lot of pain and she had difficulty sitting, standing, or doing anything because she needed to change positions. (Tr. 48). She stated that she had birth defects in both ankles, which made it difficult for her to walk. (Tr. 49). Her hip bone had also been reshaped. (*Id.*). Since the beginning of 2019, Lawrence reported that she had three surgeries: (1) labral repair; (2) reshaping of her hip bone; and (3) calcaneal osteotomy for both ankles. (*Id.*).

She indicated that there were periods of a time where she utilized a walker. (Tr. 50). She reported that she only used the walker when she went anywhere where she "[could not] hold onto something." (*Id.*). Her physical therapist indicated that she could use a cane, but she stated that her insurance would not pay for another assistive device. (*Id.* at 50-51). She had to pay for her last set of crutches. (Tr. 51). She did not use crutches because she "would fall a lot." (*Id.*).

She testified that she could stand without the walker for a couple of minutes and with a walker a little longer. (*Id.*). She reported being comfortable sitting as long as she could keep changing positions due to her hip and had to do so frequently. (*Id.*). She had a hospital bed in her room with pillows under her leg. (Tr. 54).

3

Lawrence stated that she spent her day reading. (Tr. 52). She testified that she could no longer cook as the kitchen was too small for her walker. (*Id.*). She stated that her grandmother had to help her with everything. (Tr. 53). She struggled to concentrate while reading. (*Id.*). The pain also affected her attention and concentration. (*See id.*).

If sitting at a job in an office-type setting, Lawrence testified that she would have to keep her legs elevated and constantly change positions. (Tr. 54). She indicated that it would be a struggle for her to maintain focus. (*Id.*).

### 2. Vocational Expert

Mark Anderson testified as a vocational expert ("VE") at Lawrence's ALJ hearing. The VE testified that Lawrence's past work was as a Sandwich Maker (medium and unskilled). (Tr. 55-56). The ALJ first posed a hypothetical question asking if there were any jobs available where an individual was limited to work of sedentary exertional limitations with specific additional limitations of no climbing of ladders, ropes, or scaffolds or crawling, occasional ramps and stairs, balancing, stooping, kneeling and crouching; no walking on uneven terrain or exposure to hazards such as heights, machinery, commercial driving; has the opportunity to change position up to five minutes per hour; has no concentrated exposure to temperatures, steams, humidity or environmental pollutants; and a mental limitation where she could perform routine tasks in a low stress environment, with no fast pace, strict quotas or frequent duty changes. The VE testified that past work as a Sandwich Maker would not be available, but he noted that the hypothetical person could perform jobs as a patcher, touch-up inspector, or table worker. (Tr. 57). If the person needed to be off task 20% of the time, they could not be employed. (Tr. 57-58).

Lawrence's counsel asked the VE whether there was any full-time competitive employment that a hypothetical individual limited to standing and walking for less than two hours

in an eight-hour workday and sitting for a total of four hours in an eight-hour day could perform. (Tr. 58). The VE indicated that there would be no work. (*Id.*). If a person needed to elevate her legs beyond a footstool, this would be an accommodation. (Tr. 59).

### C.  Relevant Medical/Non-Medical Opinions

#### 1. *Angela Cooke – Physical Therapist*

Angela Cooke, Lawrence's physical therapist, completed a Physical Medical Source Statement on September 1, 2020. (Tr. 770-73). Ms. Cooke indicated that Lawrence had been visiting her biweekly since July 29, 2019. (Tr. 770). Ms. Cooke opined that Lawrence could sit for about four hours and stand or walk for less than two hours per day, cannot currently lift or carry objects due to using a walker, uses a cane or other hand-held device for walking or standing more than a few minutes, and would be off task 25% or more of the workday due to symptoms. (Tr. 33, 771-72). She noted that Lawrence would have to walk around for two minutes every 30 minutes. (Tr. 771). In addition, Ms. Cooke opined that Lawrence needed to take unscheduled breaks due to muscle weakness in her ankles and pain/paresthesia and numbness in her hip. (*Id.*).

#### 2. *Karen Sabo – Mental Health Counselor*

Karen Sabo, Lawrence's mental health counselor, filled out a Mental Impairment Questionnaire. (Tr. 960-61). Ms. Sabo opined that Lawrence was "seriously limited, but not precluded" in areas of social interaction. Specifically, Ms. Sabo stated that Lawrence could interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 34, 961).

#### 3. *Lisa Foulk, Psy.D. – State Agency Medical Consultant*

5

Lisa Foulk assessed that Lawrence had no mental limitations in understanding, remembering, or applying information and interacting with others. (Tr. 100). Dr. Foulk also assessed that Lawrence had moderate mental limitation in her ability to concentrate, persist, or maintain pace. (Tr. 100). Finally, Dr. Foulk assessed a mild limitation in adapting or managing oneself. (*Id.*). Dr. Foulk found that Lawrence was capable of performing tasks in a static environment with no fast pace or high production rates. (Tr. 103).

### D.  Relevant Medical Evidence

#### 1. *Physical Symptoms and Surgeries*

On October 25, 2018, Lawrence's visit notes indicated that she had uncomplicated asthma, posterior tibial tendon dysfunction of both lower extremities with chronic pain, and recurrent major depressive disorder. (Tr. 369).

On August 6, 2018, Lawrence met with Dr. Jeffrey Junko regarding her ankles and feet with a chief complaint of pain in the ankle and instability. (Tr. 425-34). On April 5, 2019, Lawrence returned to see Dr. Junko, reporting that despite her braces, she continued to have ankle pain and her main issue was increased pain in the left lower extremity. (Tr. 418). Lawrence was referred to a surgeon for her hip. (Tr. 423).

On June 17, 2019, Lawrence was seen for her left foot. (Tr. 411-17). Dr. Junko recommended that Lawrence undergo hip surgery prior to any foot reconstructive surgery. (Tr. 416). On July 23, 2019, Lawrence had surgery on her hip (left hip arthroscopy with labral repair and femoroplasty. (Tr. 447-50). Lawrence used crutches immediately after surgery. (Tr. 711). By September 19, 2019, Dr. Seikel reported that Lawrence was no longer using any assistive device and that physical therapy would be finished later in the month. (Tr. 544).

6

On January 28, 2020, Lawrence had surgery on her left ankle, consisting of left ankle calcaneal osteotomy, FDL tendon transfer, tibial tendon tenolysis and lateral ligament repair. (Tr. 789). Lawrence began using a walker. (Tr. 1031). Approximately two weeks after her surgery, Lawrence reported burning pain and was instructed to be non-weight bearing. (Tr. 794). She remained compliant with her non-weight bearing restrictions using a walker. (*Id.*). On February 12, 2020, Lawrence was instructed to continue elevating the extremity to help control the swelling and relieve discomfort. (Tr. 800). On March 11, 2020, Lawrence was non-weight bearing. (Tr. 802). She reported burning pain on the outside of her ankle that was worse at night and dull aching calf pain. (*Id.*). She was instructed to continue elevating her extremity. (Tr. 807). In March 2020, Dr. Junko stated that Lawrence could bear weight as tolerated. (Tr. 789, 1046). In May 2020, Lawrence had a significant limp and antalgic gait. (Tr. 78).

On June 3, 2020, approximately five months after her surgery, Dr. Junko noted that Lawrence was "doing very well" with her left foot. (Tr. 1055). He also noted that Lawrence was able to ambulate with a mild limp and was able to stand unassisted and maintain balance. (Tr. 1054). Lawrence's x-rays showed that her calcaneal osteotomy was completely healed with intact orthopedic hardware. (Tr. 1055). On June 8, 2020, Dr. Mathur observed that Lawrence's gait was antalgic, but she used no assistive devices (Tr. 849).

On June 26, 2020, Lawrence had surgery on her right ankle (a right calcaneal osteotomy, FDL tendon transfer, tibial tendon tenolysis and lateral ligament repair). (Tr. 1059). On July 16, 2020, Lawrence used a scooter for knee-rest locomotion. (Tr. 777). On August 12, 2020, Dr. Junko instructed Lawrence to begin putting weight on her right foot, and Lawrence began physical therapy twice per week for six weeks. (Tr. 1079, 1083). On September 14, 2020, Lawrence met with Dr. Mathur and reported that she still had pain in her right ankle after surgery. However,

7

Lawrence indicated that with Norco, she was able to remain "functional with chores, personal hygiene, maintaining her quality of life, and performing activities of daily living." (Tr. 821). Dr. Mathur indicated that Lawrence still used a walker and had an antalgic gait at that point. (Tr. 825). However, Lawrence's strength was "functional" for ambulation. (Tr. 825). On October 13, 2020, Lawrence's treatment note indicated that she had not regained her ability to ambulate effectively. (*See* Tr. 814-19).

## 2. *Mental Health and Psychological Symptoms*

In April 2017, Lawrence began counseling for anxiety, depression, and ADHD. (Tr. 317). On May 2, 2017, she was diagnosed with ADHD and anxiety. (Tr. 327-28). She attended counseling sessions from April 2017 through December 2017. (Tr. 33-36, 339-43).

On October 11, 2018, another assessment diagnosed Lawrence with an unspecified anxiety disorder. (Tr. 332). She continued counseling through September 20, 2019. (Tr. 337-38, 347-68). During her sessions in 2019 and 2020, Lawrence had the following symptoms: anxiety (Tr. 602, 861, 868, 87-. 874, 882, 919, 932, 946, 948, 951, 953), obsessive thoughts (Tr. 602, 648), irritable mood (Tr. 603, 647, 900, 953), a constricted affect (Tr. 647), appeared nervous or anxious (Tr. 861, 879, 954, 956), had a depressed mood (Tr. 872, 874, 882, 884, 917, 919, 921, 922, 924, 928, 936, 946, 954), and had difficulty concentrating (Tr. 919, 921). Although her mood was sometimes anxious or irritable, Ms. Kaput's and Dr. Hunt's examinations revealed that Lawrence's appearance was consistently appropriate; she was consistently calm; her speech was consistently normal; she was consistently oriented; her thought process was consistently goal directed, linear, and coherent; her cognition was consistently intact; her insight was good or moderate; and her judgment was not impaired or mildly impaired. (Tr. 366, 603, 606, 644, 726-27, 757, 763, 943, 912, 896).

On December 6, 2018, Lawrence met with Dr. Hunt with a chief complaint of ADHD, anxiety, and depression. (Tr. 398). She was diagnosed with ADHD, generalized anxiety, and a moderate episode of recurrent major depressive disorder. (*Id.*).

On May 6, 2019, Lawrence again met with Dr. Hunt. She reported that things were "going okay," but she complained of some anxiety at night. (Tr. 613). On examination, Lawrence's appearance was appropriate; her demeanor/activity was cooperative and engaged; she was calm; her speech was normal; her mood was euthymic; her affect was full range; she was oriented; her thought process was goal directed, linear, and coherent; her cognition was intact; her insight was moderate; and her judgment was mildly impairment. (Tr. 628). Dr. Hunt continued Lawrence's ADHD medication regimen because it was helpful with managing her ADHD symptoms, but discontinued Mirtazapine because it disrupted Lawrence's sleep. (*Id.*).

On November 18, 2019, Lawrence met with Dr. Hunt. She reported that she "still doesn't like going anywhere," feels pressured to be more social, and has been helping her aunt because her aunt insisted upon it, though she found this contact boring and would rather stay home. (Tr. 749). On December 19, 2019, Lawrence reported to Dr. Hunt that she was scheduled for ankle surgery on January 28, 2020. (Tr. 756). She reported feeling tired a lot and "somewhat down in mood." (*Id.*). On March 30, 2020, Lawrence reported that she had worsened sleep and was always tired. (Tr. 938). On June 1, 2020, Lawrence felt that things were not going well, she was depressed, and she experienced a lack of interest, lack of motivation, and poor sleep. (Tr. 906).

## IV.    THE ALJ'S DECISION

The ALJ issued a decision on October 26, 2020, concluding in relevant part:

> 1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2020.

2.      The claimant has not engaged in substantial gainful activity since March 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: impingement syndrome of the left hip, status post arthroscopy and femoroplasty with labral repair; tibial tendon dysfunction initially treated with bracing, status post bilateral calcaneus osteotomy, FDL tendon transfer, tibial tendon tenolysis, and ankle lateral ligament repair; obesity; asthma; depressive disorder; anxiety disorder with post traumatic stress; and attention deficit hyperactivity disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except for no climbing of ladders, ropes or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching; no walking on uneven terrain or exposure to hazards (heights, machinery, commercial driving); she should have the opportunity to change position up to five minutes per hour; no concentrated exposure to temperature extremes, humidity or environmental pollutants; and mental limitation that she perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) (20 CFR 404.1569a and 416.969a).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.       The claimant was born [in December 1995] and was 20 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.       The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.       Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-36).

## V.    LAW AND ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal

standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step

Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  Separation of Powers Violation

Lawrence argues that the ALJ'S decision was constitutionally defective because the appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. For the reasons that follow, Lawrence's challenge to the constitutionality of the ALJ's decision lacks merit.

Initially, I note that Lawrence's Complaint does not include any constitutional claim. (ECF Doc. 1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" Id. (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In her merits brief, Lawrence grounds her constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to give notice of the claim when she filed her complaint in August 2021. Accordingly, her constitutional claim – advanced for the first time in her merit brief (ECF Doc. 11, PageID#2233-36) – is procedurally improper. *See, e.g., Hawes v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02848-DAR, 2022 WL 2346998, at *7 (N.D. Ohio Apr. 15, 2022), *report and recommendation adopted sub nom. Hawes v. Kijakazi*, No. 5:20-CV-02848, 2022 WL 2342642 (N.D. Ohio June 28, 2022).

Even if considered on its merits, however, Lawrence's constitutional claim fails. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to

42 U.S.C. § 902(a). *See* Social Security Administration, Executive Bios, Andrew Saul, https://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited Dec. 27, 2022). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (ECF Doc. 11, PageID#2233-34; ECF Doc. 14, PageID#2276); *see also Seila Law LLC*, 140 S. Ct. at 2197 (statutory restriction on the President's ability to remove the head of an agency "for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Collins*, the Supreme Court considered a similar statute governing the removal of Directors of the Federal Housing Finance Agency ("FHFA"). The majority held that, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

The Court in *Collins* further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788; *id.* at 1778 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11) ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment"). Rather, to

14

obtain reversal of an agency decision, a plaintiff would need to demonstrate "compensable harm" flowing from the unconstitutional removal clause. *Id*. at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.

Here, Lawrence claims she did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (*See* ECF Doc. 11, PageID#2234-35). As in *Collins*, the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Lawrence showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to her.

Other federal courts in this judicial district, this state, and across the country, have concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis. Thus, even if Lawrence's constitutional claim was procedurally proper—which it is not—she has not articulated a specific, compensable harm that she sustained as a result of the

unconstitutional removal provision in § 902(a)(3). As a result, Lawrence's first assignment of error lacks merit.

### D.  Lawrence Did Not Meet the Criteria for Listings 1.02 and 1.03.

Lawrence asserts that the ALJ erred in finding he did not meet Listings 1.02 and 1.03. Specifically, she argues the ALJ's determination that she could "ambulate effectively" is neither adequately explained nor supported by substantial evidence. As support, Lawrence cites the following evidence:

- On August 6, 2018, Dr. Junko met with Lawrence regarding her ankles and instability. (Tr. 425-34). On April 5, 2019, Dr. Junko evaluated Lawrence for her bilateral ankles. (Tr. 418-24). She was referred to a surgeon for her hip. (Tr. 423).

- On June 17, 2019, Lawrence was seen for her left foot. (Tr. 411-417). It was recommended that she have hip surgery prior to any foot reconstructive surgery. (Tr. 416).

- On July 23, 2019, Lawrence had hip surgery. (Tr. 443-50). A walker was provided. (Tr. 450).

- On September 5, 2019, Lawrence reported that her pain had improved. (Tr. 441).

- On January 28, 2020, Dr. Junko performed left calcaneus osteotomy, left FDL tendon transfer, left posterior tibial tendon tenolysis, and left ankle lateral ligament repair. (Tr. 789-93).

- Approximately two weeks after this surgery, Lawrence had burning pain. She was instructed to be non-weight bearing. (Tr. 794). She remained compliant with her non-weight bearing restrictions using a walker. (*Id.*).

- On February 12, 2020, Lawrence was instructed to continue to elevate the extremity to help control swelling and to relieve discomfort. (Tr. 800).

- On March 11, 2020, approximately six weeks after her surgery, Lawrence was non-weight bearing. (Tr. 802). She reported burning pain on the outside of her ankle that was worse at night. (*Id.*). She also reported dull aching calf pain. (*Id.*). She was instructed to continue elevating her extremity. (Tr. 807).

- On June 23, 2020, Lawrence had surgery on her right ankle. (Tr. 1059). On July 10, 2020, approximately two weeks after her right ankle surgery, Lawrence reported

16

that her pain and swelling had decreased. (Tr. 814). She was referred to physical therapy. (Tr. 819).

- At the time of the hearing, Lawrence stated that she still used a walker even to go across the bedroom. (Tr. 50).

- During the relevant period, Lawrence's primary care physician was Dr. George Seikel. Lawrence informed Dr. Seikel that she had ankle pain bilaterally, which was assessed as bilateral plantar fasciitis on March 1, 2017. (Tr. 561-62). Dr. Seikel remarked that she had limited movement of the left ankle on May 11, 2020. (Tr .780). On July 16, 2020, Lawrence appeared with swelling in her right ankle and was using a scooter. (Tr. 776-77).

- On October 13, 2020, her last treatment note indicated that she still had not regained her ability to ambulate effectively. (Tr. 814-819).

Lawrence contends that the evidence established she had dysfunction in her left hip and both ankles. (ECF Doc. 11, PageID#2238 (citing Tr. 462, 856-57)). She contends that the evidence reflects that she had three surgeries that affected her ability to ambulate effectively. (*Id.* at 2238-39). She asserts that the Listings require that a person be unable to ambulate effectively, which means that a person is unable ambulate independently without the use of a hand-held assistive device. (*Id.* at 2239). She asserts that she required the use of walker. (*Id.*). She asserts that the ALJ erred when he held Lawrence to a more restrictive limitation than required by the listing. (*Id.* (citing *Taylor v. Comm'r of Soc. Sec.*, No. 5:20-cv-2010, 2021 WL 4523443, at *14 (N.D. Ohio Oct. 4, 2021). Accordingly, she asserts that this matter should be remanded. (*Id.*).

Listing 1.02(A) requires major dysfunction of a weight-bearing joint, chronic joint pain and stiffness with signs of limited or abnormal motion, and findings on acceptable medical imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint. *See* Program Operations Manual System (POMS) DI 34121.013, Listing 1.02, https://secure.ssa.gov/poms.nsf/lnx/0434121013 (last visited Jan. 13, 2023).[2] That dysfunction

---

[2] The applicable listing is contained in POMS because POMS contains obsolete listings that were in effect at the time of the ALJ's decision.

must be of major weight-bearing joint **and** result in an "inability to ambulate effectively as defined in 1.00B2b." *Id.*, Listing 1.02A. Listing 1.03 applies to "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." *Id.*, Listing 1.03. An inability to ambulate effectively means "an extreme limitation on the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.*, Listing 1.00B2b(1). A key example of inability to ambulate ineffectively is when an individual is unable to walk without the use of a walker or another two-handed assistive device. *Id.*, Listing 1.00B2b(2). The inability to ambulate effectively "must have lasted, or be expected to last, for at least 12 months." *Id.*, Listing 1.00B2a.

In determining that Lawrence did not qualify under Listing 1.02, the ALJ found that Lawrence's impairments did not "result in the claimant being extremely limited in the ability to walk as required by 1.00B2b." (Tr. 20). For Listing 1.03, the ALJ determined that there was "no evidence that the claimant did not or will not return to effective ambulation within 12 months of onset." (*Id.*). Here, Lawrence focuses on evidence regarding her use of walker since July 2019, but she does not cite evidence between 2016 and 2019 demonstrating an inability to ambulate effectively for at least 12 months. (ECF Doc. 11, PageID#2239). Although the ALJ did not incorporate the information within his single paragraphs addressing Lawrence's qualification for Listings 1.02 and 1.03, this court may look to the entire decision for sufficient factual findings to support the ALJ's listing conclusions. *See Buckhannon v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010). The ALJ discussed medical evidence since July 2019 that demonstrated that Lawrence's

ambulation returned to a functional level after each of her three surgeries, in less than 12 months. (Tr. 26-30).

The ALJ noted that Lawrence's first surgery (left hip arthroscopy with labral repair and femoroplasty) took place on July 23, 2019. (Tr. 27, 31, 447-50). He noted that Lawrence used crutches immediately after her surgery. (Tr. 27, 711). However, by September 19, 2019, Dr. Seikel reported that Lawrence "[was] no longer using any assistive device" and that physical therapy would be finished later in the month. (Tr. 544).

The ALJ noted on January 28, 2020, that Lawrence had her second surgery (left ankle calcaneal osteotomy, FDL tendon transfer, tibial tendon tenolysis and lateral ligament repair). (Tr. 28, 1030). Lawrence began using a walker. (Tr. 28, 1031). In March 2020, Dr. Junko, Lawrence's orthopedic surgeon, stated that Lawrence could bear weight as tolerated. (Tr. 28, 789, 1046). In May 2020, Lawrence had a significant limp and antalgic gait. (Tr. 28, 780). On June 3, 2020, approximately five months after her surgery, Lawrence saw Dr. Junko. Dr. Junko noted that Lawrence was "doing very well" with her left foot. (Tr. 28, 1055). He also noted that Lawrence was able to ambulate with a mild limp and was able to stand unassisted and maintain balance. (Tr. 28, 1054). Lawrence's x-rays showed that her calcaneal osteotomy was completely healed with intact orthopedic hardware. (Tr. 28, 1055). On June 8, 2020, Lawrence met with Dr. Sanjay Mathur. He observed that Lawrence's gait was antalgic, but she used no assistive devices. (Tr. 29, 849).

Finally, the ALJ discussed Lawrence's third surgery (a right calcaneal osteotomy, FDL tendon transfer, tibial tendon tenolysis and lateral ligament repair) on June 26, 2020. (Tr. 29, 1059). The ALJ noted that her right ankle surgery was similar to her left ankle surgery. (Tr. 32). On July 16, 2020, Lawrence used a scooter for knee-rest locomotion. (Tr. 29, 777). On August 12, 2020,

Dr. Junko instructed Lawrence to begin putting weight on her right foot, and Lawrence began physical therapy twice per week for six weeks. (Tr. 29, 1079, 1083). The ALJ also noted that on September 14, 2020, Lawrence met with Dr. Mathur and reported that she still had pain in her right ankle after surgery, but she indicated that with Norco, she was able to remain "functional with chores, personal hygiene, maintaining her quality of life, and performing activities of daily living." (Tr. 29, 821). Dr. Mathur indicated that Lawrence still used a walker and had an antalgic gait at that point. (Tr. 29, 825). However, her strength was "functional" for ambulation. (Tr. 29, 825). The ALJ concluded that "[w]hile the claimant was using a walker on September 14, 2020, there is no reason to think that the claimant will continue to need an assistive device on an ongoing basis." (Tr. 32).

Although Lawrence contends that the ALJ used a "crystal ball" (ECF Doc. 15, PageID#2314) in reaching his conclusion that "there is no reason to think that the claimant will continue to need an assistive device on an ongoing basis" (Tr. 32), a holistic review of the decision suggests otherwise. Lawrence certainly cites occasions where she was using a walker. Yet, there were periods of time where Lawrence returned to being able to ambulate effectively without use of a walker. As a result, Lawrence has not demonstrated that any such inability to ambulate satisfied the twelve-moth durational period. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) ("To meet either listing, Forrest must also show that his inability to ambulate lasted or can be expected to last for at least twelve months.") (citing Listing 1.00B2a). Thus, for the reasons discussed above, the ALJ did not err at Step Three and Lawrence has not demonstrated that she met the criteria for Listings 1.02 and 1.03. Accordingly, I recommend that the Court reject this assignment of error.

Lawrence's next sub-claim with respect to these Listings 1.02 and 1.03 is that the ALJ erred because he held Lawrence to a more restrictive limitation than required by the Listing. (ECF Doc. 11, PageID#2239). She asserts that the ALJ stated she was not "extremely limited" in her ability to walk. (*Id.* (citing Tr. 20)). She contends, however, that the listing requires "that a person be unable to ambulate effectively which means that [one has] to ambulate independently without the use of a hand-held assistive device." (*Id.*). In this matter, she asserts that she required the use of a walker. (*Id.*). As a result, Lawrence contends the ALJ committed an error meriting a remand. (*Id.*).

Lawrence's assertion is not well-taken. The ALJ applied the proper limitation in analyzing whether Lawrence qualified for the criteria under Listings 11.02 and 11.03. Listing 1.00B2b(1) directly defines the "inability to ambulate effectively" as "an extreme limitation of the ability to walk." Listing 1.00B2b(1). Thus, Lawrence has not demonstrated how the ALJ held Lawrence to a more restrictive limitation than required by the Listing. Accordingly, I recommend that the Court reject this sub-claim.

Another sub-claim that Lawrence asserts is that the ALJ disregarded any evidence in this matter supporting Lawrence's evidence and testimony regarding her limitations, specifically her inability to ambulate ineffectively and her continuing need to use a walker. (ECF Doc. 11, PageID#2245-46 (citing *Bryant v. Saul*, No. 1:20-cv-1394, 2021 WL 1409214, at *12 (N.D. Ohio Apr. 7, 2021)). She asserts that the ALJ discussed "much of the evidence in this matter" but disregarded any evidence supporting Lawrence's evidence and testimony regarding her limitations, specifically her inability to ambulate effectively and her continuing need to use a walker. (*Id.*). As demonstrated above, this is not the case. A review of the decision indicates that

the ALJ considered evidence and testimony demonstrating that Lawrence may not have the ability to ambulate effectively. Accordingly, I recommend that the Court also reject this sub-claim.

### E.  Lawrence Did Not Meet Listings 12.04(B), 12.06(B), or 12.11(B).

#### 1. Listings 12.04 (B), 12.06(B), and 12.11(B)

Lawrence asserts that the ALJ incorrectly interpreted the psychological evidence in reaching the conclusion that Lawrence did not have serious limitations in her ability to function. To support her argument, she cites multiple symptoms and diagnoses:

- In April 2017, Lawrence began counseling with the Center for Families and Children for her anxiety, depression, and ADHD. (Tr. 317). On May 2, 2017, she was diagnosed with ADHD and anxiety. (Tr. 327-28). From April 2017 through December 2017, she attended counseling sessions. (Tr. 333-36, 339-43). At another assessment on October 11, 2018, she was diagnosed with an unspecified anxiety disorder. (Tr. 332). She continued counseling through September 20, 2019. (Tr. 337-38, 347-68). During her sessions in 2019 and 2020, Lawrence had the following symptoms: anxiety (Tr. 602, 861, 868, 870, 874, 882, 919, 932, 946, 948, 951, 953), obsessive thoughts (Tr. 602, 648), irritable mood (Tr. 603, 647, 900, 953), a constricted affect (Tr. 647), appeared nervous or anxious (Tr. 861, 879, 954, 956), had a depressed mood (Tr. 872, 874, 882, 884, 917, 919, 921, 922, 924, 928, 936, 946, 954, and had difficulty concentrating (Tr. 919, 921).

- On December 2018, Dr. Andrew Hunt related that Lawrence had a depressed mood, difficulty concentrating, disturbed sleep, fatigue or loss of energy, markedly diminished interest or pleasure in all or most activities, and psychomotor agitation or retardation. (Tr. 295). She had anxiety symptoms of fatigue, muscle tension, restlessness, sleep disturbance, and social anxiety. (*Id.*). She was diagnosed with ADHD, generalized anxiety, and a moderate episode of recurrent major depressive disorder. (Tr. 398).

- On May 6, 2019, Lawrence reported that she thought things were going okay but still had some anxiety at night and felt symptoms of insecurity. (Tr. 613).

- On July 25, 2019, following her hip surgery, she was unable to walk. (Tr. 629). She still had anxiety at night. (*Id.*).

- On September 26, 2019, she reported being very uncomfortable and needed help for any transfer or ambulation. (Tr. 712).

- He current medication regimen was helpful with managing her ADHD symptoms. (Tr. 727).

- On November 18, 2019, Lawrence indicated that she still did not like going anywhere. (Tr. 749).

- On December 19, 2019, Lawrence reported that she was scheduled for ankle surgery on January 28, 2020. (Tr. 756). She reported feeling tired a lot and was somewhat down in her mood. (*Id.*).

- On March 30, 2020, Lawrence related that she had worsened sleep and was always tired. (Tr. 938).

- On June 1, 2020, Lawrence felt that things were not going well. (Tr. 906). She indicated that she had a lack of interest, lack of motivation, poor sleep, and was feeling depressed. (*Id.*).

Based on this evidence, Lawrence contends that she had serious limitations with her activities of daily living. (ECF Doc. 11, PageID#2242). She also contends that the ALJ's limitations were not based on any evidence and did not support his conclusion that Lawrence only had fair limitation in the areas. (*Id.*).

To satisfy the Paragraph B criteria of Listings 12.04, 12.06, and 12.11, a claimant must demonstrate at least two marked limitations or at least one extreme limitations in the four areas of mental functioning. The four areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; or (4) adapt or manage oneself. 20 C.F.R. Pt. 404, App'x 1, Listings 12.04(B), 12.06(B), 12.11(B).

Lawrence's argument is not well-taken because the ALJ supported his finding with substantial evidence. Initially, it should be noted that Lawrence fails to establish what specific areas of mental functioning she argues should not have been found fair by the ALJ. Nor does she specifically tie any of her cited symptoms to any specific area of mental functioning. Setting aside the perfunctory nature of Lawrence's argument, Lawrence's argument nonetheless overlooks the substantial evidence. ALJ determined the following when discussing the Paragraph B criteria for the Listings:

In understanding, remembering or applying information, the claimant has a mild limitation. The claimant graduated from high school and she has attended some college (see Finding #5). She has average intelligence (1F/47). The claimant drives, shops, and manages her own money (10E/4). She performs chores, activities of daily living, and attends to her personal hygiene (8F/2). Although the claimant's mood is sometimes anxious or irritable, on examinations by Ms. Kaput and Dr. Hunt, the claimant's nurse practitioner and psychiatrist at CFC, the claimant was consistently oriented; her thought process was consistently goal directed, linear, and coherent; her cognition was consistently intact; her insight was good or moderate; and her judgment was not impaired or mildly impaired (see Finding #5). From all of this, the undersigned finds that difficulties in this area are no more than mild.

In interacting with others, the claimant has a mild limitation. The claimant has friends and she sees family members often (1F/45). The claimant has never been fired or laid off from a job because of problems getting along with other people; she gets along "good" with authority figures such as police, bosses, landlords, or teachers; and she has no problems getting along with family, friends, neighbors, or others, but sometimes it is hard for her to talk to people she does not know (10E/6-7). Although the claimant's mood is sometimes anxious or irritable, on examinations by Ms. Kaput and Dr. Hunt, the claimant's appearance was consistently appropriate; her demeanor/activity was consistently cooperative and/or engaged; she was consistently calm; and her speech was consistently normal (see Finding #5). In 2020, the claimant had counseling appointments with Karen Sabo, LPC, of CFC, on a regular basis and the sessions often dealt with the claimant's irritability and frustration with family members, particularly with her grandmother whom she lived with (see 9F/1-4, 9-18, 23-30, 39-46, 56-79, 87-101). However, any social interaction problems appear related to those she is close to (that is, family members) as opposed to people in general. From all of this, the undersigned finds that difficulties in this area are no more than mild.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant testified that she has problems concentrating. On examinations by Ms. Kaput and Dr. Hunt, the claimant's thought process was consistently goal directed, linear, and coherent and her cognition was consistently intact (see Finding #5). At appointments, her medical providers consistently documented that the claimant is "alert" (see Finding #5). However, the claimant has a history of attention deficit hyperactivity disorder dating back to high school and she takes medication for attention deficit hyperactivity disorder (see Finding #5). From all of this, the undersigned finds that difficulties in this area are no more than moderate.

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant reported that she likes routine and she does not handle

stress well (10E/7). While the claimant may exhibit some difficulty regulating her emotions, the claimant has not been psychiatrically hospitalized and she has not required or received frequent or intensive outpatient mental health services. Furthermore, there is no evidence of violent outbursts or self-injurious behavior. From all of this, the undersigned finds that difficulties in this area are no more than mild. Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 21-22).

A review of the ALJ's decision indicates that Lawrence's assertion that the "limitations described by the ALJ were not based on any evidence" is incorrect. Indeed, as demonstrated above, the ALJ provided ample substantial evidence in reaching his conclusions regarding Lawrence's limitations. Further, Lawrence's cited evidence does not demonstrate that the ALJ was compelled to find at least two marked limitations or one extreme limitations. She has failed to tie her symptoms to any of the areas of functioning nor established how these symptoms and diagnoses would have led the ALJ to a different conclusion. Significantly, the findings of the State agency psychologist, Lisa Foulk, and the opinion of Lawrence's counselor, Karen Sabo, fail to support Lawrence's assertion that she had two marked limitations or one extreme limitation. (*See* Tr. 100, 103, 960-61).

Although Lawrence otherwise argues that the evidence supported a finding of "marked" limitations in the four areas of mental functioning, on judicial review, the Court's task is not to determine whether the evidence establishes the severity requirement for paragraph B, but whether the ALJs analysis was consistent with the regulations and whether his reasons for reaching the opposite conclusion were supported by substantial evidence. 42 U.S.C. § 405(g). Here, they were. And as stated above, Lawrence has not otherwise attempted to challenge the ALJ's reasons for so concluding. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Thus, even if Lawrence pointed to evidence in her merits brief that she contends warranted greater limitations, that is

25

insufficient to overturn the ALJ's decision. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). Because Lawrence has failed to present evidence that demonstrates two marked limitations or one extreme limitation in any of the areas of mental functioning, I recommend that the Court reject this portion of her assignment of error.

### 2. *Activities of Daily Living*

Next, Lawrence asserts that the psychological evidence demonstrates that she had "serious limitations with her activities of daily living." (ECF Doc. 11, PageID#2242). But Lawrence appears to base her argument on law that is no longer applicable regarding Paragraph B criteria. In 2017, Paragraph B included "activities of daily living" as an area of mental functioning. *See* POMS DI 34142.009, Listing 12.00C. However, Paragraph B now provides different areas of mental functioning, specifically (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.04(B). Yet another issue with Lawrence's assertion is that she wholly fails to explain what specific activities that she is limited in performing or tie this assertion to any activities in the four areas of mental functioning. Moreover, she misstates the nature of some evidence she cites in support of her position. For example, Lawrence points to her statement in her Function Report that she did not go outside often, but this testimony was related to her recovery from her March 2020 surgeries, *not* her mental impairments. (Tr. 286 ("Right now with the surger[ie]s I can[not] walk and there are stairs to get out of the apartment.")).

Lawrence's next sub-claim is that, even if the ALJ was accurate in reporting that Lawrence was capable of performing some daily activities, there was insufficient evidence to prove that she could engage in substantial gainful activity. (ECF Doc. 11, PageID#2242). Citing *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 828, 838 (S.D. Ohio 2015), Lawrence contends that the ALJ

found that her ability to perform some activities meant she was not disabled. (*Id.*). Accordingly, she argues that this matter should be remanded for consideration of the totality of the evidence regarding Lawrence's limitations and the fact that the combination of her impairments and related symptoms precluded her from being able to engage in any substantial gainful activity on a sustained and full-time basis. (*Id.*). However, Lawrence's argument ignores the fact that the ALJ did not rely solely on Lawrence's daily activities in determining that she remained capable of sedentary work with additional restrictions. Indeed, the ALJ, over the span of 12 pages, also considered Lawrence's examination results, treatment history, medical opinions, and symptoms in reaching his determination. (Tr. 22-34). The ALJ did not determine that Lawrence's daily activities were sufficient evidence of non-disability.

Further, Lawrence's reliance on *Lorman v. Commissioner of Social Security,* 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015), is unavailing. In *Lorman*, the court determined that the ALJ erred when the judge relied on "minor, life-sustaining activities" as proof that the claimant's symptoms were not disabling. Here, the ALJ went beyond just relying on "minor, life-sustaining activities." For example, the ALJ noted that Lawrence worked part-time at multiple jobs after the date she alleged she was disabled, including her job as a Sandwich Maker at Subway and Stocker at Dollar General. (Tr. 23, 24, 25, 341, 425). The ALJ also discussed that Lawrence applied for and planned to attend college after the date she alleged she was disabled. (Tr. 24, 26, 341, 416). Because Lawrence has failed to demonstrate that the ALJ relied on Lawrence's daily activities in determining that she could engage in substantial gainful activity, I recommend that the Court reject this assignment of error.

### 3. Waxing and Waning Symptoms

In Lawrence's final sub-claim regarding her psychological symptoms, Lawrence contends that the ALJ did not consider that her psychological symptoms waxed and waned. (ECF Doc. 11, PageID#2243). Lawrence fails to cite to any record evidence in making this argument. (*Id.*). Moreover, to the extent that she attempts to incorporate previously cited evidence, she fails to demonstrate how those cited symptoms at their peak would be disabling or would persist at such a level for long periods. (*See generally id.*). Further she also fails to demonstrate what evidence the ALJ failed to consider. (*Id.*). Because Lawrence has failed to demonstrate how the ALJ erred, I recommend that the Court reject this assignment of error.

### F.  Evaluation of Lawrence's Subjective Pain Symptoms

Next, Lawrence asserts that the ALJ erred in properly evaluating her subjective pain symptoms. (ECF Doc. 11, PageID#2243-44). To support her argument, Lawrence generally references previously medical evidence and then points to the following testimony at her ALJ hearing:

- Lawrence testified that she could not perform full-time work as her legs caused a lot of pain. It was hard for her to sit, stand, or do anything because she needed to keep changing positions. (Tr. 48).

- Due to her hip, Lawrence had to change positions "really often." (Tr. 52).

- Lawrence used a hospital bed in her room with pillows under her leg. (Tr. 54).

- She spent her day reading. (Tr. 52). She could no longer cook as the kitchen was too small for her walker. (*Id.*).

- Lawrence's grandmother would "help [here] with everything," including tasks like cleaning the house, bringing the laundry upstairs, washing the laundry, and folding the laundry. (Tr. 53).

- She struggled to concentrate while reading. (*Id.*).

- If sitting at the job, Lawrence testified that she would have to keep her legs elevated and constantly be changing positions. (Tr. 54).

Based on this evidence, Lawrence contends that ALJ failed to properly consider the medical evidence documenting her pain and her testimony. (ECF Doc. 11, PageID#2244). Accordingly, Lawrence argues that this matter should be remanded to consider whether the continuing effects of her pain symptoms would interfere with her ability to engage in any substantial gainful activity on a sustained and full-time basis. (*Id.*).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

29

Lawrence's argument is not well-taken because it overlooks the entire analysis that the ALJ conducted on this issue. Lawrence concludes that the ALJ erred but does not specifically explain *how* the ALJ erred in his lengthy explanation of this issue. (*See* ECF Doc. 11, PageID#2243-44). Here, the ALJ assessed the objective medical evidence, including signs and laboratory findings, as well as Lawrence's course of treatment. Based on his assessment of the objective medical evidence, he concluded that her symptoms "are not consistent with disabling physical impairment or pain." (Tr. 30, 31-32). In making this conclusion, the ALJ specifically discussed at length Lawrence's visits with multiple medical providers and her recovery after her surgeries. This discussion included normal examination findings of gait and strength prior to 2019, Lawrence's work activity at Subway on her feet for most of the shift, and her recovery after each of her surgeries. (Tr. 30-32, 425, 428-29, 572).

Lawrence's specific citations to her ALJ hearing testimony are unavailing. For example, Lawrence cites her testimony at the ALJ hearing that she could not stay sitting and would often need to change positions or prop up her legs. (Tr. 32, 52, 54). However, her argument overlooks that her RFC includes a sit-stand option, permitting Lawrence to change positions for up to five minutes per hour. (Tr. 22, 33). Sedentary work entails up to two hours of sitting or standing, some switching between positions is inherent to the work. *See* Social Security Ruling 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Furthermore, while Lawrence cites to her testimony that she must switch positions frequently or that she needs to elevate her legs, she fails to point to any objective medical evidence corroborating how often she needed to switch positions or the necessity of leg elevation. Accordingly, this cited testimony does not demonstrate that the ALJ erred in the evaluation of her pain symptoms. Because Lawrence has failed to establish how the ALJ erred in

analyzing Lawrence's subjective pain complaints, I recommend that the Court reject this assignment of error.

### G.  Assessment of Obesity under Social Security Ruling 19-2p

Lawrence also asserts that the ALJ erred by failing to thoroughly analyze her obesity "beyond a perfunctory mention of the relevant Ruling." (ECF Doc. 11, PageID#2240). In particular, she asserts that the ALJ found that her obesity did not reach the level of severity required for a listing-level impairment. (*Id.* at 2240-41 (citing Tr. 20)). Yet, later in the decision, she asserts that the ALJ found that the State Agency reviewing physicians did not properly consider her obesity. (*Id.* at 2241 (citing Tr. 32)). She asserts that the ALJ failed to provide further explanation or development for this reasoning beyond limiting Lawrence to work at the sedentary level of exertion. (*Id.*). She asserts that her surgeon indicated that her weight was a major contributing factor to her impairments. (*Id.* (citing Tr. 441-42). Accordingly, she contends that the combination of her obesity and other physical problems imposed greater functional limitations than if each of the impairments was considered separate. (*Id.*)

On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p. Social Security Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity," and how SSA "evaluate[s] obesity in disability claims." SSR 19-2p, 84 Fed. Reg. 22924, 22924 (May 20, 2019). Significantly, SSR 19-2 provides that "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* at 22925; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs and ALJ to consider

the claimant's obesity, in combinations with other impairments, at all stages of the sequential evaluation") (citations omitted).

Lawrence contends that the ALJ did not meet the requirements of SSR 19-2p because he did not consider the combined effects of Lawrence's obesity and her other impairments. (ECF Doc. 11, PageID#2240). A review of the decision as a whole does not support this argument. The ALJ first considered Lawrence's obesity and her musculoskeletal and respiratory impairments, where he determined that the combined effects of her obesity with her other impairment did "not reach the level of severity required for a listing-level impairment or combination of impairments." (Tr. 20). However, the ALJ indicated that he considered any additional and cumulative effects of obesity at Finding 5 of the decision. (*Id.*). There, the ALJ discussed aspects of Lawrence's obesity. For example, as Lawrence acknowledges, the ALJ discounted the opinions of the State Agency physicians because they opined that Lawrence could perform light work. (Tr. 32-33). He stated that the doctors "did not adequately consider" the effects of Lawrence's obesity. (Tr. 32). The ALJ, in lieu of the State Agency physician's opinion, assessed that Lawrence could perform only sedentary work, with some postural limitations. (Tr. 33). He also added a limitation of no concentrated exposure to temperature extremes, humidity or environmental pollutants due to Lawrence's asthma. (*Id.*).

Lawrence's reliance on her surgeons' indication "that her weight was a major contributing factor" to her impairments (ECF Doc. 11, PageID#2241) is unavailing. She cites only a snippet of the surgeon's notation. The surgeon had stated that her weight was a "major contributing (and also modifiable) ***risk factor for the progression of underlying joint degeneration***." (Tr. 442 (emphasis added)). Thus, the surgeon's notation focused on Lawrence's risk factors, *not* on Lawrence's present condition.

In situations where the potential impact of obesity was described much more generally, the Sixth Circuit has recognized that "[t]he absence of further elaboration on the issue of obesity likely stems from the fact that [plaintiff] failed to present evidence of any functional limitations resulting specifically from her obesity." *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) (citing *Forte v. Barnhart*, 377 F. 3d 892, 896 (8th Cir. 2004) (rejecting "argument that the ALJ erred in failing to consider his obesity in assessing his RFC," because "[a]lthough his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions")); *see also Gray v. Comm'r of Soc. Sec.*, No. 20-10099, 2021 WL 298826, at *6 (E.D. Mich. Jan. 11, 2021) (finding limited findings regarding obesity sufficient where "there is no medical evidence in the record indicating that [plaintiff's] obesity increase the severity of her functional limitations or other impairments"), *report and recommendation adopted*, No. 20-10099, 2021 WL 289422 (E.D. Mich. Jan. 28, 2021); *Reese v. Comm'r of Soc. Sec.*, No. 5:20-cv-2385, 2022 WL 1090538, at *27 (N.D. Ohio Jan. 32, 2022).

Here, Lawrence has wholly failed to point to medical opinions that indicated greater functional limitations due to obesity, or cite evidence that the ALJ failed to consider. (*See* ECF Doc. 11, PageID#2239-40). Lawrence bears the burden at Step Three. She "had the burden of showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC determination." *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-cv-01849-DAP, 2021 WL 5828692, at *7 (N.D. Ohio Oct. 6, 2021) (citing *Foss v. Comm'r of Soc. Sec.*, No. 1:16-cv-1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017), *report and recommendation adopted by* 2017 WL 2908857 (N.D. Ohio July 7, 2016)). Because

33

Lawrence failed to provide evidence demonstrating that the ALJ's analysis or conclusions were in error, I recommend that the Court reject this assignment of error.

### H.  Combination of Severe Impairments

Lawrence next argues that the ALJ erred because the ALJ failed to consider her functional limitations were sufficient to establish disability. (ECF Doc. 11, PageID#2244). She contends that the ALJ offered only a "perfunctory analysis of what he considered to be the relevant Listings and related functional limitations." (*Id.* (citing Tr. 19-22)). Specifically, she contends that the ALJ failed to address all of Lawrence's functional limitations, "especially those related to the combination of her severe physical limitations, pain, and psychological limitations." (*Id.*).

The ALJ's opinion suggests differently. The ALJ referenced his obligation to consider the combination of his impairments and examined the impairments individually. (Tr. 20-22). And the discussion of both the ALJ's obligation and the individual impairments—alone—does not necessitate a finding that the ALJ failed to consider the combination of impairments. *See Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a "combination of impairments" in finding that the plaintiff does not meet the listings.") (citation omitted)). The ALJ is not required to provide an entirely separate discussion of whether the combination of impairments medically equaled the listings; he is merely required to consider the issue. Here, he said he did, and his 36-page decision gives us good reason to conclude that to be true. As a result, the ALJ's Step Three conclusions regarding the listed impairments was supported by substantial evidence and fell within his "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Furthermore, Lawrence

fails to provide any citation to specific medical evidence in making this assertion. (*See* ECF Doc. 11, PageID#2244). Accordingly, I recommend that the Court reject this assignment of error.

### I.  Full and Fair Record

Lawrence also contends that the ALJ had the obligation to conduct a full and fair inquiry into each claim and develop the record fully and fairly as to all components of the applicable Listings, including an evaluation of the evidence and an explained conclusion. (ECF Doc. 11, PageID#2244 (citing *Johnson v. Sec'y of Health and Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986) and *Reynold v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). She also asserts that the ALJ must articulate a basis for the ALJ's Step Three finding beyond a "perfunctory statement." (*Id.* at 2245 (citing *Illitch v. Comm'r of Soc. Sec.*, No. 1:17-cv-835, 2019 WL 1324050, at *9)). Lawrence contends that the ALJ erred in his analysis regarding the fact that Lawrence had not regained full weight bearing status. Thus, she asserts that ALJ provided an insufficient analysis and failed to provide sufficient information for this Court to review.

Although difficult to decipher, Lawrence's argument is construed to mean the following: (1) the ALJ provided a "perfunctory statement" articulating his Step Three findings and (2) the ALJ failed to conduct a full and fair inquiry into each claim, specifically with respect to Lawrence's failure to regain full weight bearing status. Both assertions are not well-taken. As established earlier in this Report and Recommendation, upon reading the ALJ's decision as a whole, the ALJ provided substantial evidence to support his Step Three findings regarding Lawrence's disability. Regarding Lawrence's assertion that the ALJ did not consider her failure to regain full weight bearing status, this assertion overlooks the fact that the ALJ's opinion specifically discusses her ability to bear weight on multiple occasions and references the record in support of this conclusion. (Tr.  27, 28, 29, 31). Some of this discussion also includes times where

she could not bear weight. Lawrence has not pointed to what evidence the ALJ failed to provide in this matter. Accordingly, I recommend that the Court reject this sub-claim.

### J.   Persuasiveness of Opinions

Lawrence challenges the ALJ's persuasiveness determination regarding the following professionals: (1) Angela Cooke, Lawrence's physical therapist; and (2) Karen Sabo, Lawrence's counselor.

#### 1.  *Legal Standard – Step Four*

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

#### 2. *Angela Cooke – Physical Therapist*

##### a.  <u>Parties' Arguments</u>

Lawrence contends that the ALJ erred in determining that the opinion of Ms. Cooke, Lawrence's treating physical therapist, regarding Lawrence's physical limitations were

unpersuasive. According to Lawrence, Ms. Cooke made an evaluation based on physical therapy for the pain in her left hip and bilateral ankles, along with instability, decreased balance, weakness, and decreased gait/walking tolerance. (Tr. 770). Lawrence recites the following opinions from Ms. Cooke:

- Lawrence could sit for 60 minutes and stand for five minutes. (Tr. 771).

- Lawrence would be limited to standing/walking less than two hours per workday and sitting about four hours in a typical workday. (*Id.*).

- Lawrence would have to walk around for two minutes every 30 minutes. (*Id.*).

- Lawrence needed to take unscheduled breaks due to muscle weakness in her ankles and pain/paresthesia and numbness in her hip. (*Id.*).

- Lawrence needed to use an assistive device for pain and weakness if standing more than a few minutes. (Tr. 772).

Lawrence contends that the ALJ's conclusion that Ms. Cooke's opinions were unpersuasive was in error because the evidence documented that Lawrence had not regained her ability to ambulate without assistance. (ECF Doc. 11, PageID#2247). Further, when the VE was asked questions regarding the effect of these limitations, the VE testified that there would be no jobs such a person could perform in the national economy. (*Id.*).

The Commissioner contends that Lawrence's claim is without merit. (ECF Doc. 14, PageID#2295-97). The Commissioner asserts that overall, the ALJ assessed that Ms. Cooke's opinion was largely not persuasive. (*Id.* at 2295 (citing Tr. 33)). In evaluating the opinion, the Commissioner contends that the ALJ complied with the applicable regulations at 20 C.F.R. § 404.1520c(b)(2), (c)(1), (c)(2). With respect to supportability, the Commissioner points to the ALJ's acknowledgment that Ms. Cooke reported decreased balance, instability, pain in the left hip and ankles, weakness, loss of range of motion, and decreased gait and walking tolerance. (*Id.* at 2295-96 (citing Tr. 33, 770-72)). However, the Commissioner asserts that the ALJ observed that

37

Ms. Cooke's opinion was inconsistent with other significant evidence. (*Id.* at 2296). Specifically, the Commissioner points to the ALJ's observation that Ms. Cooke's opinion was made while Lawrence "was still recuperating" from right ankle surgery. (*Id.* (citing Tr. 33, 773)). Further, the Commissioner asserts that the ALJ noted that there was "no reason to think that the [Lawrence]'s conditions will not improve within a reasonable time." (*Id.* (citing Tr. 33)). The Commissioner further points out that the ALJ cited an examination with Dr. Mathur 13 days after Ms. Cooke's opinion when Lawrence indicated that her medication helped her be functional for chores, maintain her quality of life, and perform activities of daily living. (*Id.* (citing Tr. 33-34, 821)). At this examination, Lawrence was alert, not off task, and responded promptly and appropriately to questions. (Tr. 34, 825). The Commissioner also notes that the ALJ also pointed to Lawrence's functional strength for ambulation in her legs (greater than a three out of five) although Lawrence was still using a boot and walker at that time. (ECF Doc. 14, PageID#2296 (citing Tr. 34, 825)).

In addition to noting the inconsistency between Ms. Cooke's opinion and Dr. Mathur's examination and the ordinary healing course following surgeries, the Commissioner also contends that the ALJ properly noted that Ms. Cooke was not an acceptable medical source under the agency's regulation.

The Commissioner also asserts that Lawrence incorrectly contends that Social Security regulations require the ALJ to assess the length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship. The Commissioner contends that 20 C.F.R. § 494.1520c(b)(2) does not require the ALJ to explain those relevant factors. Further, even if the ALJ had applied these factors to his decision, the Commissioner argues that the ALJ would have noted that the record did not contain treatment notes from Ms. Cooke documenting the nature and extent of the treatment relationship.

Finally, the Commissioner disputes Lawrence's argument that it was error for the ALJ to believe that Lawrence was still recuperating from the ankle surgery and use this as a basis to reject Ms. Cooke's walker limitation. Yet, the Commissioner contends that the ALJ noted that Dr. Mathur noted in September 2020 that Lawrence's prescription of opioids was time-limited. He acknowledged that Lawrence was still healing when she stated that "[o]pioids are likely only to be used for one or two months given acute postoperative pain while she heals and while workup on her pain continues." (Tr. 34, 827). Thus, the Commissioner contends it was reasonable for the ALJ to glean from Dr. Mathur's discussion that additional healing was still likely, such that Lawrence would not be limited as Ms. Cooke described. (ECF Doc. 14, PageID#2297).

In her reply, Lawrence contends that the ALJ improperly evaluated the opinion of Ms. Cooke. Relying on *Burlinghaus v. Comm'r of Soc. Sec.*, No. 1:19-cv-2713, 2021 WL 1214695, at *2 (N.D. Ohio Mar. 31, 2021), Lawrence asserts that the ALJ ignored the treating source statements and based his RFC on the fact that he expected Lawrence's condition to improve. Lawrence further contends that the ALJ did not conduct a supportability and consistency analysis.

### b.  Analysis

The Commissioner's arguments regarding whether Ms. Cooke was an acceptable medical source and whether the ALJ was required to assess the length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship are well-taken. First, Lawrence's assertion that the ALJ was required to address the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship is incorrect. Under 20 C.F.R. § 404.1520(c)(3), the ALJ is not required to explain these factors. Indeed, the regulation states, "[w]e ***may, but are not required to***, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider

39

medical opinions… in your case record." 20 C.F.R. § 404.1520c(b)(2) (emphasis added). Next, the ALJ correctly concluded that Ms. Cooke was not an acceptable medical source. Ms. Cooke is a physical therapist, which is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R. § 404.1502(a); 20 C.F.R. § 404.1520c. Thus, the remaining question is whether the ALJ's analysis complied with regulations in reaching the conclusion that Ms. Cooke's opinion was not persuasive.

The ALJ found Ms. Cooke's opinion "not persuasive," explaining:

On September 1, 2020, physical therapist Angela Cooke completed a form about the claimant's physical capabilities. Ms. Cooke reported that the claimant had symptoms of pain in the left hip and ankles, instability, decreased balance, weakness, and decreased gait/walking tolerance. She reported clinical findings and objective signs of weakness and loss of range of motion of the ankles and left hip. Ms. Cooke reported that the claimant can stand/walk less than 2 hours of an 8-hour workday and sit about 4 hours; she can only stand for 5 minutes at one time with "a lot of pain" and sit for 60 minutes at one time before needing to get up due to hip pain; she uses a can and other hand-held device for walking and standing, not all the time, but if standing for more than a few minutes; cannot "currently" lift/carry due to using a walker; and the claimant will likely be off task 25% or more of the workday due to symptoms that are severe enough to interfere with the attention and concentration needed to perform even simple work tasks (6F).

Although Ms. Cooke is not an acceptable "medical source" under the current SSA rules, the undersigned considered her input. In doing so, overall the undersigned finds that Ms. Cooke's input is not persuasive because it was completed while the claimant was still recuperating from ankle surgery on the right and there is no reason to think that the claimant's condition will not improve within a reasonable time. In fact, as[] recounted above, on September 14, 2020, the claimant saw Dr. Mathur. The claimant reported that her right ankle pain after surgery was going slower than expected. However, the claimant reported that with medication she was "functional" with chores, personal hygiene, maintained her quality of life, and performed activities of daily living. On examination, the claimant was "alert," not off task. She was cooperative, appropriately interactive, responded promptly and appropriately to questions, and no aberrant behaviors were noted. Her gait was antalgic, her right foot was in a boot, and she was using a walker, but the strength in her legs was greater than 3/5 (not normal, but fair) and "functional" for ambulation. Dr. Mathur noted that opioids were likely to be time limited (8F/2-9). However, Ms. Cooke's input that the claimant cannot sit for 60 minutes at one time before needing to get up due to hip pain is persuasive so the undersigned added the opportunity to change position up to 5 minutes per hour.

40

(Tr. 33-34).

Although the ALJ did not use the term supportability or consistency in the above evaluation, the ALJ made findings relative to the opinion related to supportability and consistency. *See Anteer v. Kijakazi*, No. 3:20-CV-00952, 2021 WL 4424475, at *16 (N.D. Ohio Sept. 27, 2021) (finding no error with the ALJ's failure to use the term "supportability or consistency" when evaluating an opinion where the ALJ's findings relative to the opinion related to "supportability and consistency"); *Hannahs v. Comm'r of Soc. Sec.*, No. 3:20-cv-01905, 2021 WL 8342817, at *11 (N.D. Ohio Dec. 15, 2021) (same). Under the Social Security Regulations, a medical opinion is more persuasive "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion." 20 C.F.R. § 404.1520c(c)(1). Regarding supportability, the ALJ addressed Ms. Cooke's opinions, specifically that Lawrence could sit for about four hours and stand or walk for less than two hours per day, cannot currently lift or carry due to using a walker, uses a cane and other hand-held device for walking or standing more than a few minutes, and would be off task 25% or more of the workday due to symptoms. (Tr. 33). He noted that Ms. Cooke reported decreased balance, instability, pain in the left hip and ankles, weakness, loss of range of motion, and decreased gait and walking tolerance. (Tr. 33, 770-72).

With respect to consistency, the ALJ's analysis addresses this issue. Under the regulations, a medical opinion is more persuasive when it is "more consistent … with the evidence from other medical sources and nonmedical sources in the claim…" 20 C.F.R. § 404.1520c(c)(2). The ALJ concluded that Ms. Cooke's opined limitations for Lawrence was not consistent with other evidence. For example, the ALJ noted that Ms. Cooke's opinion was "completed while the claimant was still recuperating from ankle surgery." (Tr. 33). In discussing Ms. Cooke's opinion,

the ALJ specifically contrasted her opinion with Dr. Mathur's opinion. Specifically, the ALJ concluded that Ms. Cooke's input was not persuasive because "it was completed while [Lawrence] was still recuperating from ankle surgery on the right and there is no reason to think that [Lawrence's] condition will not improve within a reasonable time." (Tr. 33). The ALJ pointed to evidence from Dr. Mathur's examination, which took place after Ms. Cooke provided her opinion, where Lawrence reported that with medication she was "functional" with chores, personal hygiene, maintained her quality of life, and performed activities of daily living. (Tr. 33-34, 821). He also observed that on examination with Dr. Mathur, which took place after Ms. Cooke provided her opinion, Lawrence was observed with strength in her legs greater than three out of five (not normal, but fair) and "functional for ambulation," but she had an antalgic gait and was still using a boot and walker at that time. (Tr. 34, 825). Thus, the ALJ's discussion of Ms. Cooke's opinion satisfies the purposes of the regulations and is sufficiently clear to allow for meaningful judicial review.

While Lawrence contends that the ALJ should have reached a different conclusion as to her limitations based on the combination of evidence and the opinion of Ms. Cooke, the record nevertheless supports a finding that the ALJ was supported by substantial evidence in finding Ms. Cooke's opined limitations for Lawrence "not persuasive." Here, the ALJ provided evidence in concluding that there was "no reason to think that [Lawrence's] condition will not improve within a reasonable time." (Tr. 33). Specifically, he pointed to Dr. Mathur's examination that followed after Ms. Cooke's opinion. "'[T]he substantial-evidence standard … presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal citation omitted). For the reasons set forth above, I recommend that the Court reject this assignment of error.

### 3. *Karen Sabo, LPC*

#### a.  <u>Parties' Arguments</u>

Lawrence contends that the ALJ erred in determining that the opinion of Ms. Sabo, Lawrence's treating mental health counselor, regarding Lawrence's social limitation was unpersuasive. On September 16, 2020, Ms. Sabo completed a Mental Impairment Questionnaire and opined that Lawrence had serious limitations interacting with others. (Tr. 961). The ALJ determined that Ms. Sabo was not an acceptable medical source, but he considered Sabo's input and found that her input was generally supported by her mental status examinations. (Tr. 34). However, he determined that Sabo's input about Lawrence's social limitations were not persuasive. (*Id.*). The ALJ further explained that even though Lawrence's sessions often dealt with Lawrence's irritability and frustration with family, any social interaction problems appear "related to those she is close to (that is, family members) as opposed to people in general." (Tr. 34). Lawrence contends that the ALJ's conclusion is contrary to the treatment records from Ms. Sabo. (ECF Doc. 11, PageID#2248 (citing Tr. 958-59)).

#### b.  <u>Analysis</u>

Lawrence's argument is not well-taken because the record supports the ALJ's conclusion that Ms. Sabo's opinion was unpersuasive. The ALJ found Ms. Sabo's limitation unpersuasive because Lawrence's counseling appointments focused on difficulties with her family members rather than other individuals. (Tr. 34, 872, 884, 932, 945, 948, 949, 951, 953, 954). In his decision, the ALJ referred to his earlier Listings finding that Lawrence had a mild limitation in interacting with others. (Tr. 34). To support his determination, the ALJ stated that Lawrence has friends and sees family members often. (Tr. 21, 359). The ALJ also pointed to Lawrence's statements that she had never been fired or laid off due to interpersonal difficulties, and that she got along well with

authority figures, friends, neighbors, and others. (Tr. 21, 288-89). However, the ALJ did note that Lawrence indicated that it was hard for her to talk to strangers. (Tr. 21, 288-89). The ALJ also summarized Lawrence's treatment notes showing her sometimes anxious or irritable mood, but Lawrence's otherwise appropriate appearance, and that Lawrence was consistently calm, with normal speech. (Tr. 21, 32, 366, 603, 606, 644, 726-27, 757, 763, 896, 912, 943).

Lawrence points to one piece of evidence to undercut the ALJ's finding that Lawrence has problems with family members but not people in general. Specifically, Lawrence cites evidence that she was worried about her safety because an upstairs neighbor who had been arrested had returned. (Tr. 958).  But this sole treatment note does not establish that the record supports Ms. Sabo's opined social limitations for Lawrence. Rather, as the ALJ founded, the treatment notes reflect that Lawrence mostly had problems with her family members. (Tr. 872 (expressing frustration about being used to babysit her younger siblings); Tr. 874 (requesting a short counseling session after having conflict with her brother and grandmother, which led to yelling and crying); Tr. 884 (discussing increased arguments with her grandmother and needing to leave their apartment); Tr. 932 (reporting frustrations about her recent trip to her father's house and ongoing conflict with her grandmother); Tr. 945 (reporting stress and depression from arguing with her grandmother and not having personal space); Tr. 948 (discussing arguments and noise in her apartment); Tr. 949 (reporting distress about having her mother in her household and not having privacy); Tr. 951 (reporting irritability with her grandmother); Tr. 953 (discussing ongoing conflicts with her grandmother); Tr. 954 (reporting high levels of anxiety and depression relating to tension and conflict in her home with her brother and grandmother)). The ALJ provided ample evidence from the record to support his conclusion that Lawrence did not have problems with people in general. Accordingly, I recommend that this claim be rejected.

44

### K.  Use of a Walker – SSR 96-9p

Lawrence finally contends that the ALJ should have included her need for a walker in the RFC. She asserts that the ALJ failed to address the fact that she testified that she was using a walker. According to Lawrence, this testimony was corroborated by her surgeons and the fact that she was provided a walker after her hip surgery. (*Id.* (citing Tr. 450)). Pursuant to SSR 96-9p, Lawrence contends that there was medical documentation establishing that her walker was medically necessary and describing the circumstance for which it is required. Specifically, she points to her surgeon's indication that Lawrence was non-weight bearing and her physical therapist's note that she needed an assistive device. Although the ALJ wrote that Lawrence sometimes used a walker because she was not stable (Tr. 23), Lawrence contends that the ALJ failed to include any such limitation in his RFC. Thus, Lawrence contends that this was in error and the need for a walker should have been included in the RFC.

The Commissioner contends that Lawrence failed to show any violation of SSR 96-9p. (ECF Doc. 14, PageID#2289 n.7).  The Commissioner argues that the ALJ considered "the particular facts of the case" and concluded that Lawrence did not have any medical requirement to use a walker on a regular and continuing basis, given that her ability to ambulate effectively recovered after her surgeries, or because she was still healing a few months after her June 2020 surgery. (*Id.*).

When considering a claimant's argument pertaining to the use of a walker, the analysis is guided by Social Security Ruling (SSR) 96-9p, which provides:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., ***whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information***). The adjudicator must always consider the particular facts of a case.

For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9, 1996 WL 374185 (Jul. 2, 1996) (emphasis added).

The medical evidence that Lawrence relies upon to establish the medical necessity of a walker states: "Equipment provided: walker. Patient was fit, educated and instructed in the use of wheeled walker for ambulating TDNWB on the left lower extremity. On level surfaces." (Tr. 450). Even if this satisfied the first requirement (i.e., medical documentation establishing the need for a cane), it does not fully satisfy the second requirement (i.e., medical documentation describing the circumstances for which the cane is needed). Specifically, this evidence does not establish the duration of the medical necessity. As a result, Lawrence did not satisfy the criteria under SSR 96-9p, and the ALJ did not err by not including the walker in Lawrence's RFC. Accordingly, I recommend that the Court reject this assignment of error.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Lawrence's assignments of error and AFFIRM the ALJ's decision.

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

Dated: January 19, 2023                              *s/Jennifer Dowdell Armstrong*
                                                     U.S. Magistrate Judge Jennifer
                                                     Dowdell Armstrong